## The Nahor.

*(District Court, S. D. New York.  May 21, 1881.)*

1. Collision—Libel by Owner of Vessel for Loss of Cargo—Libel by Owner of Cargo—Petition to be Made Co-Libellant—Order Consolidating Actions—Costs—Two Sail-Vessels on Crossing Courses, One of Them with the Wind Aft—Changing Course before Collision—Lights—Lookout—Vessel to Windward—Seventeenth Rule of Navigation.

A vessel, arrested upon the libel of the master and owners of another vessel, who, with the crew, libelled her for loss, by collision, of vessel, cargo, pending freight, and personal effects, having been released, on giving bail for the full amount claimed, is not liable to be again arrested on a libel by the owner of cargo, setting forth the same cause of action as to loss of cargo contained in the first suit.  The proper and usual course in such a case for the owner of cargo, if he desires to be made personally a party, is to petition to be made a co-libellant in the first suit.  Although an order upon the trial, consolidating the actions, in effect produces the same result, still, the commencement of the second action being improper, the second libellant should be charged with the costs of his action, and the bond given therein should be cancelled without regard to the result of the first suit.

Where the bark N. collided with the libellant's schooner P., about 75 miles south-east of Sandy Hook, about half past 5 o'clock A. M. in November, 1879, striking her on the stern a little to the port of the stern post and causing her to sink, and the P. was sailing on a north-east course, wing and wing, the wind being south-west, and the P. claimed that she did not see the N. until just before the collision, when, to diminish the force of the blow, or possibly to avoid the collision, she immediately changed her course, but not more than two points to port, and that the collision was caused by the N. having no lights, and not luffing to avoid it, and not keeping out of the way of the P.; and the N. claimed her course had been N. W. by N. and not N. by W., as claimed by the P., and that she kept that course and did not change to a more northerly course, as claimed by the P., but that the P. changed her course as much as four or five points, and that the collision was caused by the fault of the P. in bringing herself on a line with the N. instead of keeping out of her way, and in not sooner seeing the N.,—*held*, on the evidence, that the P.'s green light was first seen by the N. distant about a mile, and from two and a half to three points on her port bow, and that the N. was heading at the time N. W. by N. and not N. by W., as claimed by the P.   Also *held*, the evidence showing that at the instant of the collision the courses of the vessels diverged about two or two and a half points, that the P. must have changed her course just before the collision more than two points to the port, and as much as four and a half to five points; that the disappearance of the P.'s light from the view of those on the N. after it was first seen was due, not to the alleged change in the course of the N., but to the fact that the P. was not kept steady in her course; that the N.'s port light was kept burning brightly, and could have been seen by the P. as soon as the N. saw her green light; that the collision was due to the fault of the P. in not keeping a good lookout, and in not sooner seeing the N.'s light, and, being to the windward of the N., in not keeping out of her way, as required by the seventeenth rule of navigation; that the N. was not in fault, but kept her course, as she had a right and was bound to do under the seventeenth rule.

In Admiralty.

*L. C. Ledyard*, for libellants.

*H. T. Wing*, for claimants.

CHOATE, D. J.   The first of these suits is brought by the owners, master, and crew of the American schooner Pathway to recover damages for the loss of the schooner, and her pending freight and cargo, and the personal effects of the master and crew, by a collision with the bark Nahor.   The libel was filed on the twelfth of November, 1879.   The vessel was released on bail, securing the whole amount claimed in the libel.   Afterwards, on the twenty-first day of November, 1879, the second libel was filed by the owner of the cargo to recover its value.   The cause of action sued upon in the second libel is the same covered by the first libel, so far as that was a suit to recover the value of the cargo.   Bail was given also in the second suit.   The cases coming on for trial together, a motion of the libellants to consolidate the actions was granted, reserving the question of terms as to costs, etc. It is clear that the vessel, having given bail for the value of the cargo in the first action, and the action being properly brought by the master and owners as carriers, for the loss of the cargo, she was not liable to be again arrested for the same cause of action.   The proper and usual course in such a case, if the owner of the cargo desires to be made personally a party to the suit instead of trusting its management to his agents, the master and owners of the vessel, is to petition to be made co-libellant with them.   The order consolidating the actions in effect produces the same result; but as the commencement of the action was improper, the libellant Rokes must be charged with the costs of the second action, and the bond given therein must be cancelled without regard to the result of the first suit.   The alleged reason for bringing the second suit is that counsel for the owner of the cargo entertained some doubt as to the relative rights of the owners of the cargo and the vessel, in case of an apportionment of the damages between the two colliding vessels.   See *Leonard* v. *Whitwell*, S. D. N. Y. Dec. 12, 1879; *The C. H. Foster*, 1 FED. REP. 733.   In any view that may have been taken of the subject, I do not perceive that the position of the owner of the cargo could be any better as libellant in a second suit than it would have been as co-libellant in the first suit, as he could have made himself on motion.   In any view of the case the filing of the second libel, and compelling the giving of further security, was improper.

The collision took place about half past 5 o'clock on the morning of November 10, 1879, about 75 miles from Sandy Hook, which bore from the place of collision about N. by W.   The schooner Pathway

was bound from Virginia to Noank, Connecticut, with a cargo of white-oak timber. The wind was south-west, and she was sailing, just before the collision, wing and wing, on a N. E. or a N. E. ¼ E. course, her fore-boom being off to starboard and her main-boom and two jibs to port. She had a crew of five men, all told, one of whom —the captain's son—was lost overboard at the time of the collision. It was the mate's watch on deck. The mate was at the wheel, and the lookout was stationed on the forward part of the quarter deck, on the port side of the house. The captain and the two other men were below till the alarm just preceding the collision. She was a center-board schooner, of 144 tons and about 90 feet long, and was deeply laden, and making about 6 knots an hour. The bark was on a voyage from Orebick, Austria, to New York, in ballast. She had a crew of 17 men, all told. It was the master's watch on deck, and there were 8 men, including himself, in his watch. She was making a speed of about 10 knots. She had all sail set except studding sails. The night was dark, but without any fog or mist. There was a heavy sea running from a south-easterly direction.

The libel alleges that about 20 minutes past 5 o'clock those on board the schooner discovered what appeared to be the loom of a vessel about two or three points abaft the beam on the starboard side, and immediately after a bark, which was subsequently found to be the bark Nahor, came into sight about two or three points abaft the beam over the starboard quarter of the schooner, very close to said schooner, and heading about for the schooner's bow, and going at a great rate of speed, exceeding nine knots per hour; that said bark was going free, with all sails set, and with the wind on her port side; that when said bark became visible from the schooner it was too late for those on the schooner to do anything to avoid the collision, and the said bark struck the schooner on the stern, about three feet to the port side of the stern post, cutting into her so that she sank in about five hours; that when said bark was close upon said schooner and the impending collision inevitable, and in the effort to diminish the force thereof, the wheel of the said schooner was thrown to starboard, but the course of the schooner was not thereby altered more than two points; that up to the moment when the collision was inevitable, as aforesaid, the said schooner was kept steadily upon her course. The libel charges that the bark had no lights, and no competent lookout; that she did not luff in time to avoid the collision, and did not keep out of the way of the schooner.

The answer alleges that about 5:30 the lookout reported a light on

the port bow; that the captain, not being able to see the light, at once ran forward with his night-glass, on the top-gallant forecastle, and there with his glass saw a small, dim light about four points on the port bow, but at first could not tell whether it was a white or a green light, but in a moment he saw that it was a faint green light, close in, and drawing nearer, and apparently crossing the course of the bark but a short distance off; that he saw that a collision was inevitable if the two vessels kept their courses, and he at once ran aft to the man at the wheel and ordered him to put his wheel to port, but before the order could be executed so as to exert any perceptible influence on the heading of the bark by compass, the bark came in contact with some portion of the stern of the schooner, breaking the jib-boom and some of the head-gear of the bark.

The answer alleges that the bark's lights were properly set and brightly burning; that she had a competent lookout; that her course, from 4 o'clock to the time of the collision, was N. W. by N., and that she kept that course steadily till the collision; that the schooner's course was changed more than two points before the collision, and as much as four or five points. It denies the faults charged against the bark in the libel, and avers that the collision was caused by the faults of the schooner in not keeping out of the way of the bark, and in not going under the stern of the bark or luffing up in the wind; that she had no proper lights, nor a proper and sufficient lookout; that she did not see the bark sooner than she did, and did not keep out of her way as it was her duty to do; that instead of doing so she kept away right under the bow of the bark, bringing herself about on a line with the course of the bark, and that she did not show a torch-light over her quarter and stern.

The testimony from the schooner shows that the mate, who was at the wheel, first saw the bark. He describes what he saw as a small black speck over the starboard davit. He called the lookout to him. The lookout came aft by the wheel and he saw that it was a square-rigged vessel. They were alarmed at the situation, the vessel was so near, and the mate cried out, "Call the captain." The lookout ran down the companion-way, which opened aft on the quarter-deck near the wheel, to call the captain. The captain was awakened by the cry of the mate, and immediately rushed out of the cabin. He had his clothes all on except his hat. When he reached the door of the companion-way the mate pointed out the vessel. He saw that it was a square-rigged vessel, apparently heading for the schooner's bow. In his judgment it was from 200 to 400 feet away. He sprang to the

wheel and ordered the mate to go forward. His first impulse was, he testifies, to port and make the shortest possible line across the bows of the other vessel, and with that view he sung out, "Let go the fore-boom guy;" but in an instant he observed, as he thought, that the bark was keeping off, and that this movement was impossible. Accordingly, he determined to starboard his wheel and go the other way. Before his order to let go the fore-boom guy was executed, he sung out, "No, no; let go the main-boom guy and the main-peak halliards," and turned the wheel to starboard. The order was executed. The main-boom swung in, and just then, as it was going over his head, he looked up and saw the jib-boom of the bark above him. He left the wheel and ran forward, and immediately the bark struck the schooner, cutting the boat which hung on the davits about in halves, and penetrating the stern a little to port of the stern post, breaking the rudder, crowding the stern post and wheel one side, and breaking up the deck nearly to the house and upsetting the compass. The angle at which the bark struck is fixed with an approximation to certainty by the fact that her jib-boom went inside of the schooner's main rigging. The courses of the vessels at the instant of collision diverged about two or two and a half points. The conceded course of the schooner being N. E., it is evident that if the course claimed for the bark, N. W. by N., is correct, and she kept her course, the schooner must have changed four and a half to five points before the collision, and not two points only, as stated in the libel.

The testimony from the bark shows that the lookout reported a light on the port or weather bow; that the master, who was aft, was unable to see it, and went forward on the top-gallant forecastle, where the lookout pointed it out to him, and he saw it with his glass. It was seen by the man at the wheel, and by others of the men on deck. It was a dim light as they saw it, and at first they did not make out its color, but presently it was seen to be green. There is the usual diversity in the testimony as to the number of points on the bow that it bore. The libel says it was about four points. The learned counsel for the schooner has pointed out that if it was four points on the port bow, and the respective courses and rates of speed of the vessels were as claimed by the parties respectively, a collision could not have happened, since the bark would have passed the point of intersection of their courses before the schooner could have reached it, even if she had kept her course. This is a sufficient reason for the conclusion that the statement of about four points in the answer as the angle at which the light was seen, and the estimate of some of

the witnesses from the bark to the same effect, is a mistake and an overstatement. It is quite consistent, however, with the testimony from the bark that the light was seen from two and a half to three points on the port bow, and at that angle a collision was possible. From the circumstance of the dimness of the light, and the fact that its color was undistinguishable at first, I think that the light was seen from the bark about as soon as it could have been seen, and that the judgment of the witnesses that the vessel bearing it was nearly a mile distant when it was first seen, is probably correct. After it was seen to be green, the evidence of most of the witnesses is that it continued to bear at about the same angle on the bow, but to be coming nearer and nearer; that after a time the lights disappeared, and in its place was seen the loom or shadow of sails very near to the bark. The testimony of the witnesses as to the light continuing to have the same bearing is rather indefinite. It was quite evident to those on the bark that the light was the light of a vessel crossing the bows of the bark from port to starboard. When the master had made out the color of the light, he left the top-gallant forecastle and went aft. The evidence does not sustain the averment of the answer that he ran aft to give an order to the wheelsman. On the contrary, it shows that it was not till he got aft and looked again for the light, and saw the loom of sails in its place in dangerous proximity to the bark, threatening immediate collision, that he gave the order to the wheelsman to port. The testimony of both the master and the wheelsman is that the wheel was not changed before the bark struck the schooner.

It is argued, on behalf of the schooner, that it is inconsistent with the proved or admitted facts in the case that the bark was heading N. W. by N. when she sighted the light of the schooner, and that the only rational explanation of the case is that she was heading as far north as N. by W., and afterwards, when the green light disappeared by the schooner drawing so far forward as to hide it, bringing the bark more than two points abaft her beam, the course of the bark was changed two and a half points further to the north, under the supposition of those on the bark that the disappearance of the light was caused by a change of course on the part of the schooner to port. This theory is ingenious, and enforced with great skill, but I am unable to reject the positive testimony of three credible witnesses who were on the bark, and who testify positively to her course being N. W. by N. Their testimony is not overcome by any proved or admitted facts irreconcilable therewith. The disappearance of the

schooner's light may, I think, be accounted for by the fact that she was not kept steady on her course. The mate of the schooner testifies that it was very difficult to keep her steady; that she ran in the trough of the sea, which was very heavy. He admits that she yawed a point or more each way from her course, and that it required constant movements of the wheel to keep her on her course, and sometimes he had to turn the wheel completely over to bring her back. He testified, also, that the wind was quite unsteady. She was running so nearly at right angles with the course of the bark that it may well be that by her yawing the bark was brought for a brief space of time more than two points abaft her beam, which would obscure her light. It is not necessary, on the facts, to find that this disappearance of the light was for any great length of time. It was shortly before the collision, and about the time the schooner herself came plainly in view to those on the bark; and those on the bark would be very likely not to notice the light if it reappeared after they could see the schooner herself. Indeed, if the witnesses from the schooner observed the bearing of the bark aright, when they first saw her, she then bore more than two points abaft the beam, and the light must have been invisible to those on the bark. I think the testimony of the mate shows that after he caught sight of this bark he was in a state of alarm, and his attention may have been distracted from his proper duties at the wheel, and he may have let the schooner keep off somewhat without being aware of the fact. When the captain came on deck a collision was imminent. He testifies that after taking the wheel he looked at the compass, and that she was on her course, or very near it. His looking at the compass must, under the circumstances, have been a mere hasty glance. It was then a matter of seconds merely before a collision, or before a hair's breadth escape from a collision. I think little reliance is to be placed on such an observation as opposed to the positive testimony of those on the bark, taken in connection with the fact that the bark bore more than two points abaft the beam of the schooner. As to the number of points the schooner changed, the testimony of her captain, taken in connection with the libel sworn to by him, is most unsatisfactory. The libel distinctly admits two points. He swore to that when the facts were fresh in his recollection. On the trial he would hardly admit that she changed at all. This was one of the critical points in the case. This inconsistency is evidence that his mind is so much biased on the subject as to render his judgment wholly untrustworthy, without imputing to him any intention to misstate the facts. I think

it is quite consistent with the testimony that the schooner changed her course four points, or more, perhaps, partly through the carelessness or inattention of the wheelsman, before the captain took the wheel. The other circumstances, relied on as controlling the testimony of those on the bark as to her course, are not sufficiently certain or definite to overthrow the positive testimony of several witnesses. It is argued that N. by W. was the proper course of the bark, and that there was no reason for a change to N. W. by N. at 4 o'clock. But the testimony from the schooner, as well as that from the bark, shows that at 4 o'clock a sudden change in the wind to west, or north-west, was thought to be very probable, and this anticipated change is sufficient to account for a change of course somewhat to the westward of the direct course to Sandy Hook. Other circumstances need not be referred to in detail.

Assuming, then, that the course of the bark was N. W. by N., and that she made the green light of the schooner between two and three points on her port bow, at a distance of a mile or less, it is evident that the schooner was to windward, and, under the seventeenth rule of navigation, bound to keep out of the way, if the bark had her lights set and burning so that the schooner could have then seen her. The next question, therefore, is whether the bark's port light was burning. The four surviving witnesses from the schooner testify that they saw no light on the bark. Two of these witnesses—the captain and the mate's son—did not come on deck till after the captain was called. The bark herself was then in sight, and it is no unusual thing, nor should it excite surprise, that persons seeing the other vessel only immediately before the collision, and when she is herself quite visible to them, do not notice whether or not she has lights. Their attention was instantly drawn to the vessel herself, her sails and hull, and the manner of her approach. As to the mate and the lookout this is true in a far less degree, but still the lookout certainly made out the object to be a vessel as soon as he looked at it.

The mate testifies to seeing a black speck before he called the lookout, though the libel contains nothing of this, but rather gives the impression that what they first saw was what they took to be the loom of a vessel. Admitting, however, that it is a singular circumstance that these two men did not notice the light if it was there, and giving full weight to the fact as evidence of its non-existence, still they may possibly have failed to notice it; and, at any rate, the great weight of the testimony is that it was set and brightly burning at and before the collision. There is evidence that it was so set in a crane

aft that it did not show forward within about a quarter of a point of the bark's course. This, however, is immaterial, as both parties admit that the schooner was at least two points on her port bow. It follows from the finding of this fact that the schooner ought to have made the light of the bark certainly as soon as the bark made the schooner's light. The bark's light was much higher above the water, and, the bark being to leeward, it was especially incumbent on the schooner to keep a good lookout in that direction, since, if a vessel appeared there, the schooner, being to windward, was bound under the rule to keep out of her way. The schooner is therefore chargeable with fault in not keeping a good lookout, and in not seeing the bark's light.

I think the testimony shows that the bark kept her course till the collision. This she had a right and was bound to do. She is charged with fault in not luffing. She was not bound to luff. The master and mate of the schooner thought she was keeping off. In this I think they were mistaken. Where a vessel is indistinctly seen from another vessel it is easy to mistake her course, and as she comes more plainly in view and her course is more distinctly made out there is frequently an appearance of a change of course which is not real. The testimony from the bark does not sustain the point that she changed her course to starboard, nor, indeed, is such a change alleged as a fault in the libel. The captain of the schooner testified that if the bark had luffed when he first saw her he thought a collision would have been avoided. He does not testify that if she had kept on her course the collision would have been avoided. He thought there was a possibility that she might have crossed her bow if she had kept her course, and not kept off. Upon the whole case the cause of the collision was the negligence of those in charge of the schooner in not keeping a good lookout, and in not seeing the light of the bark; and, being to windward of her when there arose a risk of collision, in not keeping out of her way, as required by the seventeenth rule of navigation.

Libel dismissed, with costs.